IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

VIRGIL HOWARD,                                    )
                                                  )
                    Plaintiff,                    )
                                                  )
v.                                                )    No.1:17-CV-161
                                                  )
NEW BERN TRANSPORT CORP.,                         )
                                                  )
                    Defendant.                    )

## MEMORANDUM OPINION

This civil action is before the court for consideration of defendant's motion for summary judgment. [Doc. 18]. Plaintiff has filed a response, and defendant has submitted a reply. [Docs. 21, 22]. Oral argument is unnecessary, and the motion is ripe for the court's determination.

Plaintiff has filed suit pursuant to the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq*., for alleged discrimination based upon his age. For the reasons that follow, the motion will be granted and the case will be dismissed.

I.

*Background*

Defendant is a subsidiary of PepsiCo beverage company. [Doc. 20-1 at 5]. Plaintiff is a male in his fifties who worked for the defendant in various sales-related roles for approximately 30 years. [Doc. 20-1 at 3, 5-6; Doc. 21-3 at 1]. At the time of his termination, plaintiff was a territory sales manager in the area encompassing Chattanooga,

Tennessee, and areas in north Georgia. [Doc. 20-1 at 6; 20-19 at 3-4]. As a territory sales manager, part of plaintiff's job was to secure Customer Development Agreements ("CDAs"), in which businesses would agree to reserve a certain amount of shelf space for PepsiCo's beverage products. [Doc. 20-1 at 7]. Plaintiff was also responsible for securing state tax exemption forms from customers, which allowed PepsiCo to sell products to its customers without charging state sales tax on those products. [Doc. 20-1 at 3].

Plaintiff's direct supervisor was Todd Smith. [Doc. 20-19 at 3; 21-3 at 1]. Plaintiff states that after Smith became his supervisor, Smith made comments to the plaintiff regarding his age approximately once a week. [Doc. 20-1 at 11; Doc. 21-3 at 2]. Specifically, plaintiff states that Smith regularly referred to him as "old man," asked him whether he remembered how to turn on his computer and stated that the company needed to hire younger individuals who could adapt to technological advances. [*Id*.].

In early 2017, Smith discovered that some of the CDA Addendums and tax exemption certificates from plaintiff's customers contained customer signatures which appeared to be similar to each other. [Doc. 20-19 at 5-6]. Smith contacted Brittany Haseloff in human resources, and Haseloff instructed him to investigate the matter by contacting the customers whose forms were suspect. [Doc. 20-19 at 7-8; Doc. 21-5 at 5-6]. Smith then met with several customers, who informed him that the signatures on these documents were not their signatures. [Doc. 20-19 at 7-9]. After collecting this information, Smith and Haseloff met with plaintiff and asked him for an explanation about the signature discrepancies. [Doc. 20-1 at 11; Doc. 20-7 at 2-3; Doc. 20-19 at 9-11; Doc. 21-5 at 6]. Plaintiff did not provide any explanation for the signatures, but asked whether

the issue was being raised because of his age.  [Doc. 20-1 at 11; Doc. 20-19 at 10; Doc. 21-5 at 7].  Plaintiff admits that this was the first time that he raised his concerns about the age-related remarks to human resources.  [Doc. 20-1 at 11].  At the end of the meeting, plaintiff was suspended pending further investigation into the signatures.  [Doc. 20-7 at 3; Doc. 20-19 at 11].

After consulting with Gregg Sterling, Smith's supervisor, the decision was made to terminate plaintiff as a result of the apparently fraudulent signatures.  [Doc. 20-19 at 12; Doc. 21-5 at 9-10].  According to his deposition, plaintiff received a call from Smith and Haseloff informing him that he was being terminated for falsifying company documents. [Doc. 20-7 at 14].  Haseloff later sent plaintiff a letter indicating that he was being terminated immediately based on violations of PepsiCo's Code of Conduct, specifically, falsification of customer signatures on state tax exemption forms and customer contract addendums.  [Doc. 20-18].

## II.

### *Standard of Review*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment.  Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion."  This can be done by citation to materials in the record, which include

depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Moreover, mere conclusory and unsupported allegations, rooted in speculation, are insufficient to meet this burden. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id*. at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id*. at 251-52.

III.

*Analysis*

Plaintiff's claim for age discrimination is brought pursuant to the THRA, "a 'comprehensive anti-discrimination law,' which is 'intended to further the policies

embodied in the similar federal laws against employment discrimination.'" *Johnson v. Collins & Aikman Auto. Interiors, Inc.*, No. 1:02-cv-365, 2004 WL 1854171, at *3 (E.D. Tenn. Feb. 26, 2004). The statute provides, in relevant part, that it is a discriminatory practice for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin[.]" Tenn. Code Ann. § 4-21-401(a)(1). The Age Discrimination in Employment Act ("ADEA") "prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (citing 29 U.S.C. § 623(a)).

The stated purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964 . . . and the Age Discrimination in Employment Act of 1967[.]" Tenn. Code Ann. § 4-21-101(a)(1). Thus, courts "apply the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA." *Bender*, 455 F.3d at 620. Therefore, under both the THRA and the ADEA, a plaintiff "must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 178 (2009).

## A. Direct Evidence

Initially, the parties dispute whether direct evidence exists, and therefore, whether the *McDonnell Douglas*[1] burden-shifting framework applies.  [Doc. 21 at 8-9; Doc. 22 at 1-4].  Plaintiff asserts that his statements, in both his affidavit and deposition, that Smith made negative comments about plaintiff's age constitute direct evidence of discrimination.  [Doc. 21 at 8-9].  Defendant contends that the alleged statements were unrelated to plaintiff's termination, and therefore, are not "direct evidence" because the fact-finder is required to draw an inference from the statements to conclude that the termination decision was based upon an unlawful animus.  [Doc. 22 at 1-3].

"An employee may establish a claim under the ADEA by offering either direct or circumstantial evidence of age discrimination."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).  "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'"  *Id.* (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  On the other hand, circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Id.*  The Sixth Circuit has held that evidence that a supervisor called employees "old farts" on a "fairly regular basis" was not direct evidence of age discrimination because the plaintiffs did not allege that the statements were made in relation to the decision to

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

discharge the plaintiffs, and an inference was required to conclude that such a bias may have played a role in the decision to discharge the plaintiffs. *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 550 (6th Cir. 2004).

As in *Rowan*, plaintiff's evidence that Smith called him an "old man" approximately once a week does not constitute direct evidence, because plaintiff does not allege that Smith made such statements in relation to his recommendation to terminate plaintiff. Thus, because an inference is required to conclude that Smith's alleged bias may have played a role in the decision to terminate plaintiff, such evidence is circumstantial. *See id.*

## B. Prima Facie Case

The Sixth Circuit applies the burden-shifting framework of *McDonnell Douglas* for analyzing ADEA claims based on circumstantial evidence. *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009). Notably, the plaintiff alleges a cat's paw theory of liability. In addressing the relationship between the *McDonnell Douglas* burden-shifting framework and the theory of cat's paw liability, the Sixth Circuit held, in the context of a Family Medical Leave Act retaliation claim, that courts should first analyze a plaintiff's claim under the *McDonnell Douglas* framework, and thereafter address the issue of cat's paw liability. *Marshall v. The Rawlings Company, LLC*, 854 F.3d 368, 379 (6th Cir. 2017). Accordingly, this court will address whether the plaintiff has met the requirements of the *McDonnell Douglas* framework, and then address the issue of cat's paw liability.

To establish a prima facie case of age discrimination, using the *McDonnell Douglas* framework, a plaintiff must demonstrate that "(1) he is a member of the protected class, that is, he is at least forty years of age; (2) he was subjected to an adverse employment

action; (3) he was qualified for the position; and (4) he was treated differently from similarly situated employees outside the protected class." *Briggs v. Potter*, 463 F.3d 507, 514 (6th Cir. 2006) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004)).  Once plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Id*.  If the defendant makes the necessary showing, the burden shifts back to the plaintiff "to show that the employer's proffered reason was mere pretext for intentional age discrimination."  *Harris v. Metropolitan Gv't of Nashville and Davidson Cnty, Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010).  "The plaintiff retains the ultimate burden of proving that 'age was the 'but-for' cause of the employer's adverse action.'"  *Id*. (quoting *Gross*, 557 U.S. at 178).

Plaintiff can establish the first three factors of the prima facie case.  The problem for plaintiff arises in establishing the fourth prong of the prima facie showing, demonstrating that he was treated differently than similarly situated employees outside of the protected class.  In comparing the plaintiff's treatment to that of other employees, it is fundamental that the "comparables" are similarly situated in all respects.  *Mitchell*, 964 F.2d at 583.  "[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Id*.  The conduct at issue must be similar in type and severity, and an employer's "more severe treatment of more egregious circumstances

simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611-12 (6th Cir. 2002).

Defendant presents evidence that another employee, Jonathan Washington, was also terminated after he admitted to falsifying signatures on documents relating to an annual test drive training. [Doc. 20-19 at 14-15]. On the other hand, in his deposition, plaintiff states that his replacement, Ariel Long, who was in her twenties, had been caught falsifying company documents indicating that she had completed "route rides," which she had not actually completed, and had only been reprimanded, rather than terminated. [Doc. 20-7 at 16-17]. Even taking plaintiff's evidence as true, plaintiff has not shown that his actions in submitting inaccurate tax forms, and Long's actions in submitting falsified records regarding "route rides," are similar in severity. Plaintiff's actions in submitting tax forms that were signed by someone other than the purported business owner could raise significant legal consequences for both PepsiCo and the business owners. Conversely, Long's alleged actions in submitting company reports indicating that she had completed "route rides" that she had not actually completed, while they may impact the company's productivity and profit, are a purely intra-company matter that lack the far-reaching legal consequences that could be associated with falsified tax forms. Thus, because plaintiff's actions were significantly more severe than those of Long, plaintiff cannot establish that he was treated differently than similarly situated employees outside of the protected class. Thus, his age discrimination prima facie case fails.

## C. Legitimate, Non-Discriminatory Reason

Assuming *arguendo* that plaintiff could establish a prima facie case, the burden then shifts to the defendant to show a legitimate, non-discriminatory reason for its adverse employment action. *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 342 (6th Cir. 1997). The defendant is not required to persuade the court that it was actually motivated by the proffered reasons; it is sufficient that the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the defendant. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The defendant has met this burden. Plaintiff was terminated for violation of the company's Code of Conduct by submitting inaccurate business records, which the company suspected plaintiff had himself falsified.

## D. Pretext

Once defendant has stated a legitimate, non-discriminatory reason for its adverse action, the burden shifts to the plaintiff to show that the defendant's proffered reason is a pretext for discrimination. *Kline*, 128 F.3d at 342-43. This burden merges with the ultimate burden of persuading the court that he has been the victim of intentional discrimination. *Burdine*, 450 U.S. at 256. "[P]laintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), abrogated on other grounds by *Gross*, 557 U.S. 167 (2009).

With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no

basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996). To prove pretext, the plaintiff "must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendants intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation marks and citations omitted). At all times, the ultimate burden of persuasion remains with the plaintiff. *Burdine*, 450 U.S. at 253.

### a. No Basis in Fact

The inquiry as to whether the plaintiff has established pretext by a showing that the defendant's legitimate, non-discriminatory reason for termination has no basis in fact is not whether the facts underlying the employer's adverse action are disputed, but "whether defendant's proffered reason for terminating plaintiff has any basis in fact." *Mastellone v. Publix Super Markets, Inc.*, 179 F. Supp. 3d 784, 794 (E.D. Tenn. 2016). The Sixth Circuit had adopted an "honest belief" rule with regard to an employer's proffered reason for a termination, under which, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Thus, "an employer is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (6th Cir. 2014) (internal quotation marks omitted). For the employer's

belief to be honestly held, the employer must have "reasonably relied" on the particular facts before it at the time, and the employer is not required to use the most optimal decisional process or leave no stone unturned in its investigation. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Plaintiff argues that he has met the first method of showing pretext for two reasons: (1) he never committed the forgery, and (2) the evidence supports a conclusion that someone else at the company forged the signatures, and the only person with motive and opportunity to do so was Smith, who had made ageist comments about plaintiff. [Doc. 21 at 13]. Plaintiff further argues that the honest belief doctrine is inapplicable because Smith does not honestly believe that plaintiff forged the signatures, and the investigation was not reasonably informed and considered because it was conducted by Smith, who plaintiff accused of age discrimination. [Doc. 21 at 17-18]. In a supplemental filing, plaintiff asserts that this court's recent decision in *EEOC v. HP Pelzer Automotive Systems, Inc.*, No. 1:17-cv-31, 2018 WL 3723708 (E.D. Tenn. Aug. 3, 2018), supports the contention that the honest belief doctrine is inapplicable, and summary judgment is inappropriate. [Doc. 24].

In *HP Pelzer*, this court noted that a "particularly unique" situation had arisen, in that both parties agreed that the defendant terminated the plaintiff because she filed a complaint of sexual harassment, but the defendant argued that the complaint was false, and such dishonesty was the cause of the termination, whereas the plaintiff asserted that the complaint was true and the defendant's explanation was actually pretext. *HP Pelzer*, 2018 WL 3723708 at *7. In such situation, this court concluded that the honest belief rule was

in tension with the summary judgment standard, because the dispute over the quality of the investigation into plaintiff's sexual harassment claim was material. *Id.* Thus, this court declined to apply the honest belief rule, concluding that doing so would undermine the summary judgment standard. *Id.* at *8. The court noted that finding that the defendant honestly believed that plaintiff was not subject to discrimination was in tension with the inference that plaintiff's complaint was true, and such inference was required at the summary judgment stage. The court thus concluded that it could not ascertain the reasonableness of the defendant's belief without ascertaining the credibility of the plaintiff or of the witnesses that the defendant interviewed in its investigation of plaintiff's sexual harassment claim. *Id.*

Contrary to plaintiff's argument, *HP Pelzer* does not render the honest belief rule inapplicable in the current case, nor does it render summary judgment inappropriate. Unlike *HP Pelzer*, the reasonableness of defendant's belief that plaintiff submitted falsified company documents, and was potentially involved in the falsification of those documents, does not require a credibility determination. In his supplemental filing, plaintiff alleges that the instant case is legally similar to *HP Pelzer* because he informed the defendant "that [the] forgery concerns were 100% false and, instead, he raised to human resources a possible motive of *age discrimination*. New Bern then hired the person being accused of age discrimination (Mr. Smith) to conduct an investigation into the forgery concerns[.]" [Doc. 24 at 2]. However, plaintiff's summary is not supported by the record. First, in his deposition, plaintiff denied that he forged any signatures, but did not dispute that there were some discrepancies with the signatures. [Doc. 20-7 at 4-6]. Additionally, plaintiff

admits that he first raised the issue of age discrimination after Smith and Haseloff had begun investigating the signatures, and thus, Smith was not hired to investigate the matter after plaintiff raised the age discrimination issue. [Doc. 20-1 at 11]. Unlike *HP Pelzer*, even taking plaintiff's claims, that (1) he was not involved in the forged signatures, and (2) Smith had made age-related statements, as true, this court could nonetheless conclude that the defendant honestly believed that the plaintiff submitted documentation containing forged signatures, and thus, *HP Pelzer* is inapplicable.

Next, plaintiff relies on the following portion of Smith's deposition testimony to support his claim that Smith did not honestly believe that the plaintiff had forged signatures:

> Q: You don't believe though here today, I take it, is that fair, that he actually forged those customer signatures?
>
> A: I don't feel comfortable saying that, no.

[Doc. 20-19 at 13]. However, previously in the deposition, the following exchange occurred:

> Q: Once you completed your investigation, did you believe Virgil had forged those names or was it a situation where you just couldn't figure out how it happened?
>
> A: At that time, I felt like Virgil had submitted business records that were inaccurate.
>
> Q: At the conclusion of your investigation?
>
> A: Correct.
>
> Q: You never actually took the further step and thought that he forged those names, though; is that right?

A: The thought crossed my mind.  But the Code of Conduct says, if you submit business records, they need to be accurate.  And the customer signature needs to be the one that's on there.

And without being able to explain the discrepancy between the signatures, then what was submitted was inaccurate business records.

Q: So the termination reason, in your mind, would be not because he actually forged those customer signatures and created the inaccuracy himself, it was more just the fact that they were inaccurate and you couldn't figure out the explanation?

A: Yes.  Inaccurate business records are a violation of the Code of Conduct. And without an explanation, then it was a violation.

Q: I just want to make sure that you weren't telling your boss and Ms. Haseloff that, in your judgment, Virgil is the person who had forged customer signatures?

A: I communicated that I suspected forgery, but I'm not an expert on that.

Q: So you did communicate that you suspected Virgil had engaged in forgery?

A: I believe that was in an e-mail that we had – or a phone call that said I, you know, suspect there's an issue of forgery.

Q: An issue of forgery or you concluded that he did in fact engage in forgery?

A: An issue.  I can't confirm who signed it.

[Doc. 20-19 at 11-12].  In the full context, Smith's statement in his deposition that he was uncomfortable saying that plaintiff had actually forged customer signatures does not indicate that Smith did not honestly believe that plaintiff had submitted documentation containing forged signatures and was potentially involved in the forgery.  Instead, Smith's full testimony indicates that he suspected plaintiff of involvement in the signature forgery.

Thus, plaintiff's argument that the honest belief doctrine is inapplicable because Smith did not honestly believe that plaintiff forged the signatures is unsupported by the record.

Additionally, plaintiff's argument that the defendant's investigation was not reasonably informed because it was conducted by Smith, and therefore, the honest belief doctrine is inapplicable, fails for several reasons. First, plaintiff fails to take into consideration that, at the time of the initial investigation, defendant had no reason to believe that Smith should not be allowed to conduct the investigation, as plaintiff had not informed defendant of any issues relating to Smith, including the alleged ageist comments. Plaintiff admits that he first informed defendant of Smith's comments at the meeting that resulted in his suspension, which occurred after Smith had begun investigating the signature forgery issue. [Doc. 20-1 at 11]. Second, plaintiff fails to acknowledge that Haseloff assisted in the investigation, by directing Smith on the investigation procedure and visiting at least one customer with Smith to confirm whether the signature on a tax document was the customer's signature. [Doc. 20-19 at 7; Doc. 20-23 at 13-15]. Plaintiff has not alleged that Haseloff expressed any age-based animus towards him at any time. Third, plaintiff has not indicated how the information that Smith collected during his investigation, including statements from customers that their signatures were not the signatures on the submitted documentation, and a comparison of the signatures on the documentation and the customers' actual signatures, was in any way tainted by Smith's alleged animus. Plaintiff's only allegation in this regard is his conclusory assertion that Smith must have forged the signatures. However, such a conclusory, unsupported allegation, rooted in

speculation, is insufficient to raise a factual issue for purposes of summary judgment. *See Bell*, 351 F.3d at 253.

Because plaintiff has not shown that the honest belief rule is inapplicable, his argument that he did not commit any forgery is insufficient to show pretext, because the evidence indicates that the defendant honestly believed that plaintiff had submitted documentation with forged signatures, and plaintiff was potentially involved in the forgery. Defendant reasonably relied on the information that Smith collected from customers during the course of the investigation, which indicated that the signatures on various tax exemption forms and CDA addendums were not the customer's actual signatures. Accordingly, even if plaintiff could prove that he was not involved in the forgery, because defendant reasonably believed that he was involved, plaintiff cannot show that defendant's legitimate, non-discriminatory reason is pretextual because it is not based in fact. *See Majewski*, 274 F.3d at 1117.

### b. Did Not Actually Motivate the Termination

For a plaintiff to prove pretext under the second method, he must admit the factual basis underlying the employer's proffered explanation and further admit that such conduct could motivate dismissal. *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Under this method, the plaintiff must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. The honest belief rule does not apply when the plaintiff relies on the second method of showing pretext,

that the stated reason did not actually motivate her termination. *Joostberns v. United Parcel Serv.*, 166 F. App'x 783, 794 n.5 (6th Cir. 2006).

Initially, defendant argues that the plaintiff cannot show pretext under this method, because he does not admit that he committed the forgery. [Doc. 19 at 24; Doc. 22 at 11-12]. Defendant's reliance on plaintiff's denial that he forged the signatures is misplaced. Although plaintiff continues to deny that he forged any customer signatures, plaintiff does not necessarily dispute that there are some potential discrepancies with the signatures, and indicates that he does not know why the signatures are different than those of the store owners. [Doc. 20-7 at 4-6]. Thus, plaintiff does not necessarily deny that he submitted documentation that contained forged signatures, and this court will not rely on plaintiff's denial of his involvement in the forgery as a basis for finding that he cannot show pretext under the second method.

Plaintiff argues that an inference can be drawn that the fraudulent signatures did not actually motivate his determination, based on (a) the lack of evidence that plaintiff committed the forgery, (b) Smith's "constant ageist statements," and (c) defendant's failure to investigate the age discrimination claim. [Doc. 21 at 14]. However, plaintiff has not shown that the "sheer weight" of this evidence makes it more likely than not that the defendant's stated reason for his termination was pretextual. First, contrary to plaintiff's allegation that there was no evidence that he committed the forgery, both Smith and Haseloff stated in their depositions that they suspected that plaintiff had committed the forgery after investigating the matter. [Doc. 20-19 at 11-12; Doc. 20-23 at 19]. Although there was no direct evidence that plaintiff himself forged customer signatures, the evidence

uncovered through Smith and Haseloff's investigation indicated that the signatures on the documents were not the customers' signatures, and the documentation that contained these false signatures was submitted by plaintiff. [*See* docs. 20-25, 20-26, 20-27]. Thus, the defendant could have inferred that, at the least, plaintiff submitted inaccurate documentation, and was potentially involved in the forgery.

Second, taking plaintiff's evidence that Smith made comments about his age as true, plaintiff has not alleged that Smith made any age-related comments in the context of plaintiff's termination or the investigation leading to plaintiff's termination. Thus, several inferences are required to conclude that Smith recommended plaintiff's termination based on age-related bias, and these comments alone are insufficient to show that it is more likely than not that defendant's proffered reason for plaintiff's termination is pretextual.

Third, regarding the lack of investigation into the age-related comments, plaintiff has not shown that he provided specific information to support an investigation. Plaintiff states that he told Haseloff at the suspension meeting that Smith had been "calling [him] names and stuff like that," and stated that he could provide an e-mail, but Haseloff did not allow him to go to his computer. [Doc. 20-7 at 14]. Haseloff did not say that she would investigate the age-related comments. [Doc. 20-7 at 14]. Haseloff recalls plaintiff raising this issue at the suspension meeting, but states that plaintiff was unable to share specifics about why he felt that he was being discriminated against, and therefore, there was no information for her to investigate. [Doc. 20-23 at 22]. Haseloff stated that plaintiff was only able to tell her that Smith had made a comment, but was unable to share the specific comment, and Haseloff asked Smith whether he had made any age-related comments,

which Smith denied. [Doc. 20-23 at 23-26]. Haseloff did not recall plaintiff requesting to retrieve an e-mail containing age-related comments. [Doc. 20-23 at 24]. Given that plaintiff provided only general statements that Smith "called him names," the fact that Haseloff did not carry out a full investigation into any age-related bias against plaintiff, even combined with Smith's alleged comments, is not sufficient to show that it is more likely than not that defendant's stated reason for termination was pretextual.

### c. Insufficient to Warrant Termination

The third method of showing pretext ordinarily consists of evidence that other employees, particularly those not in the protected class, engaged in substantially identical conduct, but were not terminated. *Manzer*, 29 F.3d at 1084.

Plaintiff argues that a Code of Conduct violation alone would not have been sufficient for Smith to recommend termination, because Smith himself endorsed various Code of Conduct violations, including: (a) instructing office personnel to use company credit cards to pay for group lunches and dinners, which Smith would falsely approve as customer lunches; (b) reducing expired product by taking such product to a local food bank and recording it as a charitable gift; and (c) trading company beverages for alcohol at a distributer, using the alcohol at company-sponsored golf tournaments, and recording the exchange as a "donation to charity." [Doc. 21 at 15-16]. Plaintiff raised such alleged violations in his affidavit, filed after his deposition. [Doc. 21-3].

Defendant argues, in its reply, that plaintiff's allegations against Smith in his affidavit are improper, because he was previously asked in his deposition if he was aware of any other individuals who falsified company documents, and he did not identify Smith.

[Doc. 22 at 14].  Defendant argues that, because plaintiff's later-filed affidavit is inconsistent with his deposition testimony, the affidavit is inadmissible and should not be considered.  [*Id*.].  "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony."  *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  However, in his deposition, plaintiff only stated that he was unaware of any individuals other than Long that had falsified company documents and not been terminated.  [Doc. 20-7 at 17].  Arguably, plaintiff's allegations in his affidavit regarding Smith relate to various Code of Conduct violations, but not necessarily falsifying of company documents, and thus, his affidavit is not necessarily contradictory to his deposition testimony.  Accordingly, this court will consider plaintiff's allegations.

Even assuming that plaintiff's allegations regarding Smith's misconduct are true, such allegations are insufficient to show that other employees engaged in substantially identical conduct but were not terminated.  None of Smith's alleged acts relate to falsification of state tax exemption forms, which could subject PepsiCo to legal scrutiny by the state government.  Plaintiff himself agreed during his deposition that forged signatures on tax exemptions forms would be a serious matter that could potentially expose PepsiCo to scrutiny from the State of Georgia.  [Doc. 20-7 at 7].  Accordingly, because Smith's alleged acts lack the same potential legal ramifications as plaintiff's alleged acts, plaintiff has not shown that Smith acted "substantially similar" but was not terminated.

### d. Shifting Explanations for Termination

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). Plaintiff argues that the defendant's explanation for his termination has shifted from an initial explanation that plaintiff was terminated because he forged customer signatures, to a new explanation that plaintiff was terminated because he violated PepsiCo's Code of Conduct in submitting inaccurate business records. [Doc. 21 at 16].

The record belies this assertion. An email written by Haseloff, regarding the investigation into plaintiff before his termination, was titled "Confidential: Investigation into Accurate Business Records of Howard, Virgil." [Doc. 20-21 at 1]. The termination letter sent to plaintiff on March 17, 2017 from Haseloff states that on March 13th, plaintiff was "made aware of an allegation that [he] had violated PepsiCo's Global Code of Conduct," specifically, by falsifying documentation. [Doc. 20-18]. The letter indicates that plaintiff's termination was based on "serious violations of PepsiCo's Code of Conduct; specifically, falsification of customer/owner signatures on state tax exemption forms and customer contract addendums." [*Id*.]. In its memorandum supporting its motion for summary judgment, the defendant states that it terminated plaintiff "for a serious violation [of the] Code of Conduct, specifically, falsification of customer signatures on CDA Addendums and tax exemption certificates that has [sic] false customer signatures." [Doc. 19 at 19-20]. The defendant then explains that, under its Code of Conduct, employees are responsible for the accuracy of business records that they submit, and plaintiff violated the

Code by submitting documents with false signatures, which resulted in his termination. [*Id.* at 20].

The fact that the defendant appears to now indicate that plaintiff violated the Code of Conduct by submitting business records that contained falsified signatures, even if plaintiff did not himself falsify the signatures is not a "changing rationale," but rather, a more complete explanation of why plaintiff's actions violated the Code of Conduct, even if he had not actually forged customer signatures. Moreover, the e-mails from the investigation indicate that PepsiCo was concentrated on the Code of Conduct violation regarding inaccurate records from the beginning. Thus, contrary to plaintiff's assertion, there is no changing rationale that evidences that defendant's stated reason for plaintiff's termination is pretextual.

### E. Cat's Paw Liability

Plaintiff alleges that Smith's statements regarding his age are relevant under the "cat's paw" theory of imputed animus. [Doc. 21 at 18]. Under the "cat's paw" theory, a plaintiff may challenge an employer's action as improper even if the ultimate decisionmaker was neutral and was not motivated by discriminatory animus. *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 677 (6th Cir. 2008). The theory applies when a biased subordinate employee, who lacks decision-making power, influences the unbiased decisionmaker to make an adverse employment decision. *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008). In relying on a "discriminatory information flow, the ultimate decisionmakers [act] as a conduit" to the non-decisionmaker's prejudice. *Madden*, 549 F.3d at 678.

The Supreme Court has held that, to find liability under a cat's paw theory, a plaintiff must establish two elements: (1) a biased non-decisionmaker intended to cause an adverse employment action, and (2) the discriminatory action was a proximate cause of the ultimate employment action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (applying the cat's paw theory to a claim under the Uniformed Services Employment and Reemployment Rights Act). However, under the heightened standard of causation in the AEDA, cat's paw liability applies if: (1) a non-decisionmaker, because of his age bias, took actions intended to have plaintiff terminated; and (2) those actions were the but-for cause of the decision-makers ultimate decision to terminate. *Mastellone,* 179 F. Supp. 3d at 795. Because the cat's paw theory rests on the premise that a decisionmaker might rely on the recommendation of a biased lower-level superior, the honesty or sincerity of the decisionmaker's belief is irrelevant, and thus, the honest belief rule is inapplicable. *Marshall*, 854 F.3d at 380.

Plaintiff appears to assert that Smith was the biased non-decisionmaker who intended to, and did in fact, cause plaintiff's termination. Even assuming that Smith was biased and intended to cause plaintiff's termination, plaintiff cannot show that Smith's actions were the "but-for" cause of his termination. Although Smith was involved in the investigation of plaintiff after the signature discrepancies were discovered, Haseloff, who plaintiff does not allege had any age-related bias, directed the investigation, including instructing Smith on procedure. Additionally, Haseloff herself was involved in visiting at least one customer and discussing the signature discrepancies with them. Thus, because Haseloff, a non-biased party, was significantly involved in the investigation, it cannot be

said that Smith's alleged bias in the investigation was the but-for cause of plaintiff's termination.

Moreover, it is unclear how an unbiased decisionmaker could have relied on a "discriminatory information flow" from Smith, when plaintiff has not alleged that any of the information Smith submitted was inaccurate or that Smith withheld information about the investigation. At the conclusion of his investigation, Smith e-mailed Haseloff and Sterling, stating that he had documentation for three discrepancies on tax exempt certifications and three discrepancies on CDA documentation. [Doc. 20-22 at 1]. Smith attached scanned signature comparisons. [*Id*. at 1-2]. Smith reported that he visited three locations in Georgia: Cochran's, St. Clair's, and Megastar, and at each location, either the owner, or a family member of the owner, confirmed that they did not recognize the signature purporting to be that of the owner on the CDA addendums. [*Id*. at 2]. Based on these findings, Smith recommended that plaintiff be terminated. [*Id*. at 3]. As to Megastar, sworn declarations of the store owner and the owner's daughter confirm that Smith met with the owner's daughter, and she did not recognize the signature on the CDA addendum as her father's signature. [Docs. 20-25, 20-26]. Because the information that Smith provided to Sterling, the unbiased decision-maker, appears to be based solely upon the factual information that Smith uncovered during his investigation, supported by customer statements and documentation, plaintiff cannot show that the termination decision was the result of a discriminatory information flow. Therefore, he cannot succeed on a cat's paw theory of liability.

## IV.

### *Conclusion*

Accordingly, for the reasons stated herein, defendant's motion for summary judgment will be granted, and the case will be dismissed. An order consistent with this opinion will be entered.


ENTER:


_____s/ Leon Jordan_____
United States District Judge